## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

EDWARD L. HARDESTY, et al.,      )
                                 )
Plaintiffs,                      )
                                 )
vs.                              )     NO. 2:03-CV-310
                                 )
INTERNATIONAL STEEL GROUP,       )
INC., et al.,                    )
                                 )
Defendants.                      )

## ORDER

This matter is before the Court on: (1) Defendants International Steel Group Inc.'s and ISG Indiana Inc.'s Motion for Summary Judgment (DE# 56) and (2) Plaintiffs' Motion for Summary Judgment on Liability and as to Defendants' Affirmative Defenses 2, 4 and 5 (DE# 59).  For the reasons set forth below, Defendants' Motion for Summary Judgment (DE#56) is **GRANTED.**  Plaintiffs' Motion for Summary Judgment (DE#59) is **DENIED.**  Accordingly, this case is **DISMISSED with prejudice** and the Clerk is **FURTHER ORDERED** to **CLOSE** this case.


## BACKGROUND

On July 30, 2003, Plaintiffs, Edward L. Hardesty, Roger Scott and William Ackors, along with Alan D. Fejes, commenced this action against Defendants, International Steel Group, Indiana Harbor, Inc., and International Steel Group, Inc. (collectively "ISG" or

"Defendants") pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, for breach of a labor contract.  In response, Defendants filed a motion to dismiss, which resulted in the dismissal of then-Plaintiff, Alan D. Fejes, from this case.

On September 2, 2004, Plaintiff was granted leave to file an amended complaint.  The amended complaint included a class action allegation.  On February 15, 2005, Plaintiffs filed their motion for class certification.  Shortly thereafter, Judge Moody recused himself from the case and it was reassigned here.  This Court denied Plaintiffs' motion for class certification on July 21, 2005.  In the meantime, the parties filed cross-motions for summary judgment.  As the motions for summary judgment share common issues of law and fact, they will be decided together.  The motions are now fully briefed and ripe for adjudication.


DISCUSSION

The standards that generally govern summary judgment motions are familiar.  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record must reveal that no

reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *NUCOR Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).  "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (emphasis in original) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by

specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Facts

LTV Steel Company ("LTV") owned a steel mill in East Chicago, Indiana ("Mill"). Plaintiffs were long-term employees at the Mill. LTV entered into bankruptcy and, in November and December 2001, LTV laid off substantially all of its employees, including Plaintiffs, before ceasing production operations on December 19, 2001. Although laid off, Plaintiffs were still employees of LTV on and after December 19, 2001. (Pls.' Mem. in Supp. of Mot. for Summ. J., p. 2; Ex. 2). During this period, the United Steelworkers of America, AFL-CIO-CLC ("USWA"), through its Local Union 1011, served as the exclusive bargaining representative of the production and maintenance employees at the Mill, including the Plaintiffs. (Am. Compl. ¶¶ 10-11; Edward

-4-

Hardesty Dep. p. 25).  A collective bargaining agreement in effect between USWA and LTV governed the terms and conditions of employment of those working at the Mill at the time of Plaintiffs' layoffs. (Agreement between LTV Steel and USWA attached as Ex. B to Defs.' Mot. for Summ. J.).

ISG purchased LTV's assets pursuant to a bankruptcy auction on February 28, 2002.  (Thomas Wood Dep., pp. 6-7).  Prior to this purchase, ISG stated its intention to hire those USWA bargaining unit employees employed by LTV as of December 19, 2001, to work in the newly acquired facilities.  (Wood Aff., ¶ 6; David McCall Aff., ¶ 6) In anticipation of the start of production at the mill, ISG negotiated an agreement with the USWA.  (Wood Dep., p. 28; Wood Aff., ¶ 6) During these negotiations, the USWA represented all LTV employees who were employed by LTV as of December 19, 2001, including Plaintiffs. (McCall Aff., ¶¶ 3, 6; Loren Hansen Aff., ¶¶ 3, 4).  In accordance with the USWA Constitution, LTV employees as of December 19, 2001, remained members of the USWA in good standing for 24 months after LTV ceased operations.  (McCall Aff., ¶ 4).

These negotiations between ISG and USWA resulted in an April 11, 2002, letter of understanding ("April Agreement").  The April Agreement set forth, among other things, the terms and conditions under which ISG was to hire those "individuals who were, on December 19, 2001, employees of LTV." (April Agreement, Art. II, attached as Ex. H to Defs.' Mot. for Summ. J.).  The April Agreement also provided

that ISG would conduct this process "in what may be restructured jobs, in the same manner as though it were LTV conducting a recall." *Id*. In addition, ISG agreed to recognize the USWA as the exclusive bargaining representative for all employees of ISG performing work of a like or similar nature to the work performed by employees covered, as of December 19, 2001, by the labor and benefits agreements between LTV and USWA. (April Agreement, Art. III). By its terms, the April Agreement became effective on April 12, 2002, which was the closing date on the purchase of the LTV assets.

On July 17, 2002, ISG and USWA entered into an interim collective bargaining agreement ("July Agreement"), which supplemented the April Agreement. The July Agreement included a detailed and mandatory grievance and arbitration procedure for the resolution of any disputes between ISG and USWA regarding workplace issues. (July Agreement, attached as Ex. B to Defs.' Mot. for Summ. J.). The July Agreement's grievance procedure required the Union member to submit a grievance within 30 days from the date on which the grievant knew or should have known of the grievance. *Id*. The grievance procedure further provided that all differences arising regarding the "interpretation or application of or compliance with the provisions of this or any other Agreement between [ISG] and the [USWA]" must be resolved through the grievance procedure. *Id*. All former LTV employees covered by the April Agreement remained bargaining unit members required to submit differences over the interpretation or application of collectively

-6-

bargained agreements to the grievance and arbitration procedures set forth in the July Agreement.  (McCall Aff., ¶ 11.)

ISG processed and resolved grievances of former LTV employees with various claims of violations of Article II of the April Agreement, which governs the hiring of employees, many of whom were not actively employed with ISG at the time they submitted their grievances.  (Wood Aff., ¶ 13; Hanson Aff., ¶ 14.)  Plaintiffs were not offered employment by ISG.  Plaintiffs claim that they were not hired, in contravention of the April 11, 2002, labor agreement reached between ISG and USWA (Pls.' Am. Comp., ¶ 25.); however, they did not file grievances contesting ISG's failure to hire them.  (Wood Aff., ¶ 13; Hanson Aff., ¶ 16.)


Section 301 of the Labor Management Relations Act

Generally, employees suing an employer or their representative union for breach of a labor agreement pursuant to section 301 must first exhaust grievance procedures under that labor agreement before seeking relief in the federal courts. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652-53 (1965).  The exhaustion requirement is not arbitrary; rather, its purpose is significant — to prevent the circumvention of a union's broad authority, as the exclusive bargaining representative for all members of its bargaining unit, to negotiate and administer a collective bargaining agreement. *See Hazen v. Western Union Tel. Co.*, 518 F.2d 766, 769-70 (6th Cir. 1975)("The

requirement that an employee exhaust his contractual remedies before bringing an action against an employer under a collective bargaining agreement is designed to prevent actions which undermine the union's authority.").  Preventing this kind of circumvention is necessary as a union's exclusive bargaining position and its broad authority to negotiate and administer a collective bargaining agreement are essential for the preservation of industrial peace and stability. *See Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785 (1996)("The object of the National Labor Relations Act is industrial peace and stability, fostered by collective-bargaining agreements providing for the orderly resolution of labor disputes between workers and employees.").  Of course, with the benefit of increased bargaining strength generated by many bargaining unit members acting through one exclusive representative comes the burden of subordinating certain interests to the bargaining unit as a whole.  This includes the right to seek judicial review on the merits of one's claim that his employer breached the collective bargaining agreement. *See Vaca v. Sipes*, 386 U.S. 171, 182 (1967)("The collective bargaining system as encouraged by Congress . . . of necessity subordinates the interests of an individual employee to the collective interest of all employees in the bargaining unit.").

    With these principles in mind, it should not come as any surprise that the exhaustion requirement not only applies in cases where the plaintiff is a current member of the bargaining unit, but also applies

in those cases where the plaintiff is a former member of the bargaining unit whose claims involve events which occurred while the plaintiff was a member of the bargaining unit. *See, e.g., Merk v. Jewel Food Stores Div.*, 848 F.2d 761, 766 (7th Cir. 1988)("Persons . . . covered by a collective bargaining agreement - even those no longer working - must exhaust union remedies before filing suit under § 301."); *Roman v. United States Postal Serv.*, 821 F.2d 382, 286-87 (7th Cir. 1987)(determining that despite the fact that plaintiff was no longer an employee of defendant employer, plaintiff was still obligated to exhaust grievance procedure as plaintiff's claim concerned events which occurred while he was a member of the collective bargaining unit to whom the Union owed a fair duty of representation). Likewise, it should also not come as any surprise that the exhaustion requirement has limitations. It has been held that an "unrepresented former employee who alleges that he is an intended beneficiary of a collective bargaining agreement may bring a section 301 action against his former employer for its alleged breach without exhausting contractual remedies providing for union representation." *Zaluski v. Bethlehem Steel Corp.*, 1989 WL 118743, at *5 (W.D.N.Y. Oct. 4, 1989)(relying on and interpreting the opinions in *Merk v. Jewel Food Stores Div.*, 848 F.2d 761 (7th Cir. 1988) and *Anderson v. Alpha Portland Indus., Inc.*, 727 F.2d 177 (8th Cir. 1984)). Thus, when a plaintiff is a third-party beneficiary — neither an employee nor represented by the union — of a contract between a

union and an employer, that plaintiff need not exhaust any grievance procedures contained in the contract before filing suit.  It is this "third-party beneficiary exception" to the exhaustion requirement that Plaintiffs seek to apply to their case.

The third-party beneficiary exception cannot apply in those cases where the plaintiff is a member of the bargaining unit whose rights and obligations of employment are governed by the labor agreement alleged to have been breached by a defendant employer.  Otherwise, the plaintiff could effortlessly undermine the exclusive authority of his representative unit to enforce his rights and obligations under that collective bargaining agreement — just the sort of behavior the exhaustion requirement seeks to avoid.  *See Hazen*, 518 F.2d at 769 ("The requirement that an employee exhaust his contractual remedies before bringing an action against an employer under a collective bargaining agreement is designed to prevent actions which undermine the union's authority.").

The Plaintiffs claim that they are third-party beneficiaries (and can claim a third-party exception to the exhaustion requirement) to the April Agreement because, although the April Agreement was to directly benefit them, they were neither employees of ISG nor members of the bargaining unit.  Plaintiffs direct this Court to the April Agreement which states, "[ISG] agrees to recognize the Union as the exclusive collective bargaining representative for all employees of [ISG] performing work of a like or similar nature to the work

performed by employees covered, as of December 19, 2001, by labor and benefits agreements between the Union and LTV Steel . . . ." (April Agreement, Art. III).  Plaintiffs argue that because they were never actually hired by ISG, they were not employees of ISG and, therefore, not members of the defined bargaining unit.  Such a reading of Article III, however, runs afoul of the established labor law which holds that when a successor employer such as ISG makes it clear that it intends to retain the predecessor's employees and that the union will represent a majority of those employees, such an obligation attaches, before employees have been hired.  *Fall River Dyeing & Finishing Corp. V. NLRB*, 482 U.S. 27, 41 (1987); *NLRB v. Burns Int'l Sec. Ser., Inc.*, 406 U.S. 272, 278-81 (1972); *New Breed Leasing Corp.*, 317 NLRB 1011, 1025 (1995).  Plaintiff's interpretation also runs afoul of USWA's admitted scope of representation — all LTV employees who were employed by LTV as of December 19, 2001, including Plaintiffs.

Nevertheless, while it is undisputed that the Plaintiffs were never hired by ISG,[1] that fact does not necessarily mean that Plaintiffs are not deemed ISG "employees" under the National Labor Relations Act, 29 U.S.C. § 152(3).  Indeed, the term "employee" under section 2(3) is to be interpreted broadly and understood with

---

[1] The parties make much ado regarding certain "factual" conclusions in Judge Moody's February 9, 2004, Order.  However, that decision was made in deciding a motion to dismiss, whereas the instant order is made in an entirely different context- a motion for summary judgment.  Thus, such consideration must be made when reading Judge Moody's order.

reference to the purpose of the Act.  *National Labor Relations Board v. Hearst Publications*, 322 U.S. 111, 129 (1944).  The Supreme Court has noted that, "the [National Labor Relations] Board has held that applicants for employment and registrants at hiring halls — who have never been hired in the first place — as well as persons who have quit or whose employers have gone out of business are 'employees' embraced by the policies of the Act."  *Allied Chemical*, 404 U.S. at 168.  In fact, the Board has held that individuals employed at the time of the sale of an employing enterprise become can become "employees" of the purchaser even when they have yet to be actually hired.  *See Chemrock Corp.*, 151 NLRB 1074, 1078 (1965)(reasoning that when "the only substantial change wrought by the sale of a business enterprise is the transfer of ownership, the individuals employed by the seller of the enterprise must be regarded as 'employees' of the purchaser as that term is used in the Act.  Such individuals possess a substantial interest in the continuation of their existing employee status . . . .").

In this case, the undisputed evidence leads this Court to the conclusion that the Plaintiffs were employees of LTV up to the sale of ISG and that they became statutory "employees" of ISG at the time of that sale.  The Plaintiffs were laid-off LTV employees waiting to be rehired by LTV's successor, ISG, pursuant to the negotiations between USWA and ISG.  Surely, the Plaintiffs possessed a substantial interest in the continuation of their existing employee status, which

-12-

presents a far different scenario than the line of cases Plaintiffs rely on – *Karo v. San Diego Symphony Orchestra Assoc.*, 762 F.2d 819 (9th Cir. 1985) and *Merk v. Jewel Companies, Inc.*, 848 F.2d 761, 766 (7th Cir. 1988) – to stand for the proposition that they are not "employees" of ISG.

The undisputed evidence also leads this Court to the conclusion that the Plaintiffs were all members of the bargaining unit.  It is undisputed that ISG expressed an intent to hire LTV employees as though it were LTV conducting a recall.  (April Agreement, Art. II). In such a situation, ISG was not free to set initial terms and conditions of employment without bargaining with USWA.  *New Breed*, 317 NLRB at 1025.  During these negotiations, the USWA represented all LTV employees who were employed by LTV as of December 19, 2001, including Plaintiffs.  (McCall Aff., ¶¶ 3, 4, 6; Loren Hansen Aff., ¶¶ 3, 4). Thus, there is no dispute that ISG had an obligation to bargain with USWA, and that it did so, resulting in the April and July Agreements. As the Plaintiffs were members of the USWA and the USWA owed a duty of fair representation to Plaintiffs regarding obtaining employment with ISG, Plaintiffs were required to exhaust the grievance procedures contained in the July Agreement, which they did not do.  On that basis, summary judgment is appropriate.

CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (DE#56) is **GRANTED**.  Plaintiffs' Motion for Summary Judgment (DE#59) is **DENIED**.  Accordingly, this case is **DISMISSED with prejudice** and the Clerk is **FURTHER ORDERED** to **CLOSE** this case.


DATED:  October 11, 2005        /s/RUDY LOZANO, Judge
                                United States District Court